## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TANYA HEWLETTE-BULLARD, on behalf of her minor child, J. H-B., <br><br> Plaintiff, <br><br> vs. <br><br> POCONO MOUNTAIN SCHOOL DISTRICT, DR. ELIZABETH ROBINSON, in her individual capacity, and DR. MARY BETH GUSTAFSON, in her individual capacity, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) CIVIL ACTION NO. ____ <br> ) <br> ) <br> ) ELECTRONICALLY FILED <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT

Plaintiff J. H.-B., by and through his mother, Tanya Hewlette-Bullard ("Parent"), brings this action under Federal law and the laws of the Commonwealth of Pennsylvania. As set forth in detail below, Defendants deprived Plaintiff of his right to freedom of speech under the First Amendment to the United States Constitution, discriminated against him on the basis of disability, and expelled him from school without due process of law in violation of Article I, Section 1 of the Pennsylvania Constitution, 22 Pa. Code Chapter 12, Pennsylvania's Local Agency Law, and the policies of the Pocono Mountain School District.

## JURISDICTION AND VENUE

1. This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1331. This case arises under the First Amendment of the United States Constitution, as made applicable to the states by the Fourteenth Amendment, and the laws of the United States, specifically, 42 U.S.C. §§1983 and 1988, as amended.

1

2. This Court also has subject matter jurisdiction over the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504") claims pursuant to 28 U.S.C. § 1331. These claims arise under the laws of the United States.

3. This Court has supplemental jurisdiction over claims made pursuant to Article I, Section 1 of the Pennsylvania Constitution, 22 Pa. Code Chapter 12, and Pennsylvania's Local Agency Law. These claims are so related to the claims that are within this Court's original jurisdiction that they form part of the same case or controversy.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). A substantial part of the events and omissions complained of herein occurred within the jurisdiction of this Court and, on information and belief, Defendants all reside in this district.

## PARTIES

5. Plaintiff J. H.-B. is a 17-year-old student at Pocono Mountain East High School ("East High School"), which is located in Swiftwater, PA, and is part of the Pocono Mountain School District. J. H.-B. lives with his mother in Tannersville, PA. At all relevant times, J. H.-B. was a student in the Pocono Mountain School District.

6. Plaintiff Tanya Hewlette-Bullard is J. H.-B.'s mother. She brings this action on behalf of J. H.-B.

7. Defendant Pocono Mountain School District ("District") is a political subdivision of the Commonwealth of Pennsylvania. Its administrative offices are located at 474 Grove Street, Honesdale, PA, 18431. As a local municipal government body, the District is a "person" subject to suit within the meaning of 42 U.S.C. § 1983.

8. Defendant Dr. Elizabeth Robinson ("Robinson") is, and at all relevant times was, the Superintendent of the District. At all relevant times, she was acting under color of state law and was a final policymaker for the District regarding the interpretation and application of its student discipline rules. Plaintiff sues her in her individual capacity.

9. Defendant Dr. Mary Beth Gustafson ("Gustafson") is, and at all relevant times was, the Assistant Superintendent for Special Education of the District. At all relevant times, Gustafson was, by virtue of her status as an employee of the District, acting under color of state law. In addition, she was, at all relevant times, a policymaker for the District. Plaintiff sues her in her individual capacity.

## FACTUAL BACKGROUND

10. J. H.-B. is a Junior at East High School and a welding student at Monroe Career & Technical Institute ("MCTI"). He attends each program for half the day.

11. J. H.-B. was diagnosed with Asperger's Syndrome and Tourette Syndrome when he was approximately nine years old.

2

12. J. H.-B. has a history of receiving special education supports and services as a student identified with autism. Moreover, according to a re-evaluation report dated May 5, 2017, prepared by the District's psychologist, the District believes J. H.-B. is a student with a disability under the IDEA categories Other Health Impairment and Autism.

13. Prior to the 2017-2018 school year, J.-H.B. had no record or history of disciplinary actions in school.

### A.  J. H-B.'s Out-of-School Speech

14. In September 2017, the District claimed that J. H.-B. had posted to his personal Instagram account a profile picture and image memes that had been uploaded to other websites (such as www.reddit.com/r/dankmemes/ and www.funnyjunk.com) that some considered offensive or in poor taste, but which had been posted originally and reposted by J. H.-B. for the purposes of dark humor, parody, and/or satire.

15. J. H.-B. made these posts to his Instagram account while in his home and from his own personal smartphone.

16. J. H.-B's posts were made outside of school hours, off school grounds, and without the use of a school-owned device or instrumentality.

### B.  The District's Actions

17. On information and belief, in late September 2017, a community member expressed concern about the memes that J. H.-B. posted to his Instagram account. The District then sought out information regarding J. H.-B.'s social media activities from others, including other students at East High School.

18. Parent met with representatives from the District and MCTI. The District demanded that J. H.-B. undergo a mental health assessment. Parent agreed to privately fund a mental health assessment and psychological evaluation of J. H.-B.

19. Parent also learned that the District was requiring J. H.-B. to check in with the guidance counselors at East High School and MCTI, something for which she had been given no notice and to which she had not consented. She called the District to ask that they discontinue the check-ins because she had not consented to them.

20. At the meeting, the District showed Parent selected images and memes from J. H.-B's Instagram account. The memes were presented out of context and Parent was not permitted to fully examine them. Parent requested that the District provide her copies of the memes so she could provide them to the evaluator performing J.H.-B.'s psychological evaluation. The District refused and told Parent to "go home and copy them yourself."

21. Effective October 2, 2017, the District and MCTI excluded J. H.-B. from his regular educational placement at East High School and MCTI. The District initially claimed that this exclusion was a suspension.

22. Neither the District nor MCTI provided J. H.-B. with an informal hearing pursuant to 22 Pa. Code §§ 12.6 and 12.8 within five days of beginning J. H.-B.'s suspension.

23. Instead, the District and MCTI met with Parent on October 4, 2017, and October 6, 2017, to discuss additional allegations against J. H.-B. Among other things, the District claimed to Parent that J. H.-B. had posted a "video of a student with a gun to his head attempting to fire it at his temple." After the District showed that video to Parent—which it described as "deeply disturbing"—it ignored Parent's observation that the gun in the video was, in fact, a colorful Nerf Blaster toy.

24. At each of these meetings, Parent acknowledged some of the District's concerns and claims against J. H.-B. as worthy of further inquiry. Parent further agreed to convey all of the District's concerns to the mental health professionals evaluating the student. The District provided Parent with a written statement of its concerns dated September 20, 2017. It sent a supplemental letter on October 9, 2017.

25. Parent provided the District's September 20, 2017 letter and copies of the memes identified by the District to the practice of Dr. Dustan A. Barabas, P.C., which performed the mental health assessment and psychological evaluation of J. H.-B. at Parent's expense over the course of two in-person evaluation sessions: one on October 7, 2017, and one on October 13, 2017. Parent did not receive the District's October 9 letter until late in the day on October 13, 2017. The evaluation had concluded earlier that day.

26. On October 13, 2017, after the mental health assessment and psychological evaluation of J. H.-B., Dr. Barabas opined that J. H.-B. was not a present danger to himself or to others. Dr. Barabas further "recommended that [J. H.-B.] return to school resuming his regular schedule."

27. Parent promptly provided the District and MCTI with this report. She asked that the Defendants return J. H.-B. to his educational placement.

28. Defendants refused to do so. They informed Parent that J. H-B. could not return to his educational placement. Defendants further informed Parent that they had barred J. H.-B. from District and MCTI grounds indefinitely, and that J. H.-B. would instead receive five hours of instruction per week from District and MCTI tutors.

29. J. H.-B. never received any tutoring for his MCTI class during the entire three-month expulsion, despite Parent's repeated requests.

30. MCTI nonetheless began lowering J. H.-B.'s grades because of absences and failure to complete hands-on welding tasks that could only be completed on MCTI's grounds.

31. Despite Dr. Barabas's report and conclusions, the District further demanded that Parent require J. H.-B. to undergo a forensic psychological evaluation and a psychoeducational evaluation (which, unlike a mental health assessment, does not include measures exploring present or future risk of dangerousness) and a psychiatric evaluation (which also does not include measures exploring present or future risk of dangerousness) by the providers of its choice.

32. Even though J. H.-B. had been excluded from his educational placement for more than ten consecutive school days, and even though more than 15 days had elapsed since the disciplinary incident giving rise to Student's exclusion from school, Defendants did not hold a formal hearing as required by 22 Pa. Code § 12.8.

33. Throughout November and early December 2017, Defendants continued to exclude J. H.-B. from his educational placement at East High School and MCTI's welding program.

34. The District finally spoke with Dr. Barabas on or about December 6, 2017. On information and belief, during that conversation, the District demanded that Dr. Barabas give a guarantee that Student could not be dangerous in the future. On information and belief, Dr. Barabas responded that such forecasting was not possible, while standing behind his report and conclusions.

35. On December 7, 2017, Parent, the District, MCTI, and counsel for Parent and the District met to discuss J. H.-B's return to his educational placement at East High School and MCTI.

36. During that meeting, the District admitted that it would consider J. H.-B.'s return to one of its schools appropriately safe only if J. H.-B. was (1) was accompanied full-time by an aide, (2) submitted to searches of his person and belongings upon entry to both the high school and MCTI, and (3) participated in daily check-ins with the guidance counselors at the school and MCTI.

37. At that meeting, the Parties further agreed that J. H.-B. would undergo independent psychoeducational, psychiatric, and forensic psychological assessments *while in school.*

38. On December 19, 2017, even though the Parties were actively engaged in efforts to identify the agreed-upon independent evaluators, the District filed a Due Process Complaint against Parent with the Pennsylvania Office for Dispute Resolution, seeking an order requiring Student to undergo assessments by evaluators of the District's choice.

39. Two days later, on December 21, 2017, the District rescinded the Permission to Evaluate forms that it had issued to Parent for the independent psychoeducational, psychiatric, and forensic psychological evaluations.

40. On January 11, 2018, after being expelled from school by Defendants for over three months for engaging in First Amendment-protected speech, J. H.-B. was finally permitted to return to school but was subject to multiple searches and constant surveillance each day.

On information and belief, the District has not subjected any of its non-disabled students to such indignities.

41. On February 16, 2018, and March 16, 2018, J. H.-B. underwent a Forensic Psychological Evaluation with Dr. William F. Anzalone, Jr., Psy.D. The evaluation was requested by Superintendent Gustafson, on behalf of the Pocono Mountain School District, to "assess a diagnosis of J. H.-B.'s current mental condition, and to determine his social, emotional, behavioral and academic needs." The District also asked Dr. Anzalone to opine on whether J. H.-B. posed a risk to the school.

42. In addition to meeting with and evaluating J. H.-B., the evaluator interviewed Parent, the principal at MCTI, one of J. H.-B's teachers at MCTI, one of J. H.-B.'s teachers at East High School, one of J. H.-B.'s former teachers at East High School, and two assistant principals at East High School.

43. The evaluator diagnosed J. H.-B. with Autism Spectrum Disorder (ASD), level 1, without accompanying intellectual impairment and without accompanying language impairment (provisional); Rule Out Specific Learning Disorder (mathematics); Rule Out Attention Deficit Hyperactivity Disorder.

44. The evaluator opined that "[J. H.-B.] has mild symptoms of ASD but his symptoms of impaired social interaction, deficits in social-emotional reciprocity and deficits in nonverbal communicative behaviors used for social interaction have directly related to the concerns observed and reported by [J. H.-B.'s] peers, teachers and additional school personnel."

45. Dr. Anzalone further concluded that "within a reasonable degree of psychological certainty . . . [J. H.-B.] has a sense of humor that is not understood or appreciated by all. At times, he makes insensitive statements that can be offensive to some but some of his statements are also viewed to be taken out of context. At times he can be immature, especially when he is around peers that he is attempting to fit in with. He makes racial or sexual statements to get a rise out of his peers and are not to be taken literally."

46. Dr. Anzalone further concluded that J. H.-B.'s "lack of emotional reaction is consistent with symptoms of ASD."

47. Finally, Dr. Anzalone opined that "based on a reasonable degree of psychological certainty, based on the totality of the evidence presented, [J. H.-B.] demonstrates no risk to a low risk of future violence. Therefore, [J. H.-B.] is viewed to be psychologically stable to safely return to school unaccompanied."

48. On April 11, 2018, and May 2, 2018, J. H.-B. met with Dr. Steven Kachmar for an Independent Educational Evaluation. In a letter dated May 10, 2018, Dr. Kachmar stated

that "at the time that the testing, interview, and observation were conducted, there were no indications that [J. H.-B.] had intent to harm himself, peers, or his educators."

49. At the District's insistence, J.H.-B. underwent yet another evaluation. On May 11, 2018, Dr. Richard Fischbein interviewed J. H.-B. as part of a forensic psychiatric evaluation. After reviewing all records provided by the District, including Dr. Barabas and Dr. Anzalone's evaluations, Dr. Fischbein also concluded that J. H.-B. does not appear to present a danger to himself or others.

50. In short, just as Dr. Barabas had concluded only days into J. H.-B.'s months-long exclusion from school following his engaging in constitutionally protected out-of-school speech, excluding J. H.-B. from school was not just an irreparable loss of his valuable instruction time, it was baseless.

51. Despite consistent findings by four doctors that J.H.-B. did not present as a danger, J. H.-B. was searched every day at East High School and MCTI for the rest of the 2017/2018 school year.

## CLAIMS

## COUNT I: VIOLATION OF J. H-B.'S FIRST AMENDMENT RIGHT TO FREE SPEECH
(Against Pocono Mountain School District)

52. Plaintiffs incorporate the allegations contained in paragraphs 1- 51 above as if set forth fully herein.

53. The Supreme Court in *Tinker v. Des Moines Independent Community School District* established the general rule that school officials may not restrict student speech unless the school officials can demonstrate that the speech "threatens a specific and substantial disruption to the school environment . . . ." *B.H. ex rel. Hawk v. Easton Area School District*, 725 F. 3d 293, 303 (3d Cir. 2013) (citing *Saxe v. State College Area School District*, 240 F. 3d 200, 211, 214 (3d Cir. 2001) (citing *Tinker*, 393 U.S. 503, 504 (1969)).

54. "This burden cannot be met if school officials are driven by 'a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular view point.'" *J.S. v. Blue Mountain School District*, 650 F. 3d 915, 926 (3d Cir 2011) (quoting *Tinker*, 393 U.S. at 509). Rather, "*Tinker* requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." *Saxe*, 240 F.3d at 211. As the Supreme Court has made clear, an "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker*, 393 U.S. at 508.

55. The Supreme Court has carved out a few narrow exceptions to the *Tinker* rule. One exception is set forth in *Bethel School District v. Fraser*, which allows for schools to

7

restrict lewd, vulgar, and offensive speech *in school*. *Fraser*, 478 U.S. 675, 683 (emphasis added); *see also B.H. ex rel. Hawk*, 725 F.3d at 304; *see also J.S.*, 650 F.3d at 932.

56. In *J.S. v. Blue Mountain School District*, the United States Court of Appeals for the Third Circuit reiterated that the exception to *Tinker*, carved out in *Fraser*, does not apply to off-campus speech. *Id.* "In other words, *Fraser's* 'lewdness' standard cannot be extended to justify a school's punishment of [a student] for use of profane language outside the school, during non-school hours." *Id. See also Layshock v. Hermitage School District*, 650 F.3d 205 (3d Cir. 2011) (en banc) ("noting that a principal could not punish a student for speech that was 'degrading, demeaning, demoralizing, and shocking' because the speech was made online, out-of-school."); *B.L. v. Mahanoy Area School District*, 289 F. Supp. 3d 607, 612 (2017).

57. While J. H.-B.'s speech might be seen by some as distasteful, it occurred online, out-of-school, outside of school hours, without the use of a school-owned device.

58. Further, J. H.-B.'s speech did not cause a specific or substantial disruption in school, nor could it have reasonably caused school officials to forecast a substantial disruption or material interference with school activities.

59. Even though J. H.-B.'s speech was made out-of-school, outside of school hours, on his own personal device, the District punished J. H.-B. for his speech by excluding him from school without due process of law for over three months; forcing him to undergo not one, not two, but four separate evaluations; and, even when it finally permitted J. H.-B. to return to school, by subjecting him to daily searches of his person and having an aide "shadow" him.

WHEREFORE, Plaintiffs request the following relief:

   a. Declare unconstitutional the District's policy, custom, or practice of punishing students for out-of-school speech that does not cause or threaten a substantial disruption to the educational environment;

   b. Award compensatory damages for the emotional distress, mental anguish, and reputational harm J. H.-B. suffered as a result of Defendants' violation of his First Amendment rights in an amount to be proven at trial;

   c. Order the District to expunge this incident from J. H.-B.'s disciplinary record at both East High School and MCTI;

   d. Award Plaintiffs reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988;

   e. Award punitive damages sufficient to deter Defendants from pursuing similar unconstitutional disciplinary actions in the future; and

   f. Grant such other relief as the Court deems necessary and appropriate.

## COUNT II: VIOLATION OF J. H-B.'S FIRST AMENDMENT RIGHT TO FREE SPEECH
(Against Defendants Robinson and Gustafson in their individual capacities)

60. Plaintiffs incorporate the allegations contained in paragraphs 1- 59 above as if set forth fully herein.

61. While acting under color of state law, Defendant Gustafson issued or approved J. H.-B.'s suspension for engaging in protected speech off school grounds, despite clearly established case law finding that the speech J. H.-B. engaged in was constitutionally protected.

62. Furthermore, Defendant Gustafson participated and approved of J. H.-B.'s *de facto* expulsion and sought to further punish J. H.-B. for engaging in protected speech by requiring that he submit to not one, but four evaluations.

63. On information or belief, Defendant Gustafson either initiated or approved the "safety check" plan that required J. H.-B. to be searched upon entering East High School and MCTI and to be followed by an aide while at school.

64. While acting under color of state law, Defendant Robinson issued or approved J. H.-B.'s suspension for engaging in protected speech off school grounds, despite clearly established case law establishing that the speech J. H.-B. engaged in was constitutionally protected.

65. Furthermore, Defendant Robinson knew of and approved of J. H.-B.'s *de facto* expulsion and approved the additional punishment levied on J. H.-B. for engaging in protected speech by requiring that J. H.-B. submit to not one, but four evaluations.

66. On information or belief, Defendant Robinson either initiated or approved the "safety check" plan that required J. H.-B. to be searched upon entering East High School and MCTI and to be followed by an aide while at school.

**WHEREFORE**, Plaintiffs request the following relief:

a. Declare unconstitutional the District's policy, custom, or practice of punishing students for out-of-school speech that does not cause or threaten a substantial disruption to the educational environment;

b. Award compensatory damages for the emotional distress, mental anguish, and reputational harm J. H.-B. suffered as a result of Defendants' violation of his First Amendment rights in an amount to be proven at trial;

c. Award Plaintiffs reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988;

d. Award punitive damages sufficient to deter Defendants from pursuing similar unconstitutional disciplinary actions in the future; and

e. Grant such other relief as the Court deems necessary and appropriate.

## COUNT III: VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT
### (Against Pocono Mountain School District)

67. Plaintiffs incorporate the allegations contained in paragraphs 1- 66, above, as if set forth fully herein.

68. Section 504 of the Rehabilitation Act, as applied to public schools that receive federal funding, requires that School Districts "shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. 104.33(a).  Under Section 504, "an appropriate education is the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

69. Under Section 504, an "individual with a disability" is a person who "has a physical or mental impairment which for such individual constitutes or results in a substantial impediment to employment; and . . . can benefit in terms of an employment outcome from vocational rehabilitation services provided pursuant to" subchapter I, III, or VI of Title 29, Chapter 16 of the Code of Federal Regulations. "Qualified individual with a disability" is, in the secondary education context, a "student with a disability who is: of an age at which students without disabilities are provided elementary and secondary educational services; of an age at which it is mandatory under state law to provide elementary and secondary educational services to students with disabilities; or a student to whom a state is required to provide a free appropriate public education under the Individuals with Disabilities Education Act (IDEA)." 34 C.F.R. § 104.3(l).  *See also* Department of Education Office of Civil Rights, *Protecting Students With Disabilities: Frequently Asked Questions about Section 504 and the Education of Children with Disabilities* ¶ 13 (2013), http://www2.ed.gov/about/offices/list/ocr/504faq.html.

70. If a child needs or is believed to need special education or related services under Section 504, the school district is prohibited from making a significant change in that child's placement without first conducting an evaluation or reevaluation of that student's needs. *See* 34 CFR 104.35(a) ("A recipient that operates a public elementary or secondary education program or activity *shall* conduct an evaluation in accordance with the requirements of paragraph (b) of this section of any person who, because of handicap, needs or is believed to need special education or related services *before taking any action with respect to* the initial placement of the person in regular or special education and *any subsequent significant change in placement*.") (emphases added).  *Accord* Department of Education Office of Civil Rights, *Protecting Students With Disabilities: Frequently Asked Questions about Section 504 and the Education of Children with Disabilities* ¶ 30 (2013), http://www2.ed.gov/about/offices/list/ocr/504faq.html ("Section 504 also requires a school district to conduct a re-evaluation prior to a significant change of placement.").

71. A significant change in placement occurs when a district excludes a child from school for more than ten consecutive school days. *See, e.g., Springfield School District #186,* 55 IDELR 206 (OCR June 29, 2010). A significant change in placement also occurs when the district transfers the child to another type of program. *See* Department of Education Office of Civil Rights, *Protecting Students With Disabilities: Frequently Asked Questions about Section 504 and the Education of Children with Disabilities* ¶ 30 ("OCR would also consider transferring a student from one type of program to another . . . a significant change in placement.").

72. Prior to the events of September 2017 that led to the District's suspension of J. H.-B. effective October 2, 2017, the District knew that J. H.-B. was a student with a disability who was in need of special education or related services.

73. The District therefore knew that it was required to conduct an evaluation of J. H.-B. prior to significantly changing his placement via an expulsion.

74. J. H.-B. was excluded from East High School and MCIT for over three months while the District subjected him to repeated and needless psychiatric and psychological evaluations. On information and belief, the District did not subject, and has not subjected, any of J. H.-B.'s similarly-situated, non-disabled peers to such treatment.

75. J. H.-B. was subjected to two psychological evaluations, a forensic psychiatric evaluation, daily searches upon entering East High School and MCTI, one-to-one supervision by a paraprofessional, constant oversight from school personnel, and a search of his home and personal property.

76. J. H.-B. was treated differently and worse than neurotypical students who have engaged in protected speech.

77. In J. H.-B.'s second District mandated psychological evaluation, Dr. Anzalone noted that J. H.-B.'s "symptoms of ASD are mild but consist of a persistent impairment in social interaction and a restricted, repetitive pattern of behavior (by history)." Dr. Anzalone goes on to opine, within a reasonable degree of psychological certainty, that J. H.-B.'s "lack of empathy or emotional connection should not be viewed as a higher level of risk but more as symptoms of ASD."

78. The District punished J. H.-B. for the symptoms of his ASD. J. H.-B. was punished because he did not act or respond to the Defendants' disapproval of his protected speech in the ways that Defendants—who knew of his diagnoses—consider "normal."

**WHEREFORE,** Plaintiffs request the following relief:

a.   Issuance of a declaratory judgment against Defendant, declaring that the District violated the rights of J. H.-B. under Section 504 as set forth in this Complaint;

b.   Issuance of an injunction directing Defendant Pocono Mountain School District to expunge the suspension from J. H.-B.'s disciplinary record;

    c.      The award of Plaintiffs' attorney's fees and costs; and

    d.      Such other relief as the Court deems necessary and appropriate.

## COUNT IV: VIOLATIONS OF THE ADA
### (Against Pocono Mountain School District)

79. Plaintiffs incorporate the allegations contained in paragraphs 1- 78, above, as if set forth fully herein.

80. To prevail on a claim under the ADA, a plaintiff must show: (1) he is a qualified individual with a disability; (2) he was either excluded from or otherwise denied the benefits of some public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits or discrimination was by reason of the plaintiff's disability.

81. J.H.-B., who is diagnosed with Autism Spectrum Disorder, was expelled from school and denied the right to attend East High School and the welding program at the MCTI because he engaged in protected speech, outside of school, and then displayed symptoms of his ASD, such as a lack of empathy or emotional connection, which made the Defendants feel uncomfortable.

82. Even after receiving four psychological evaluations that concluded, among other things, that J. H-B. posed low to no risk of violence, Defendants excluded J. H.-B. from his education because he, following his protected speech, did not act or respond to the Defendants' disapproval in the ways that Defendants—who knew of his diagnoses—consider "normal." Defendants thereby discriminated against J. H.-B. on the basis of his disability.

**WHEREFORE**, Plaintiffs request the following relief:

    a.      Issuance of a declaratory judgment against Defendant, declaring that the District violated the rights of J. H.-B. under the ADA as set forth in this Complaint;

    b.      Issuance of an injunction directing Defendant Pocono Mountain School District to expunge the suspension from J. H.-B.'s disciplinary record;

    c.      The award of Plaintiffs' attorney's fees and costs; and

    d.      Such other relief as the Court deems necessary and appropriate.

**COUNT V: DEPRIVATION OF DUE PROCESS RIGHTS UNDER ARTICLE I,
SECTION I OF THE PENNSYLVANIA CONSTITUTION, PENNSYLVANIA
LOCAL AGENCY LAW, AND PENNSYLVANIA CODE TITLE 22, CHAPTER 12**
(Against Pocono Mountain School District)

83. Plaintiffs incorporate the allegations contained in paragraphs 1-82, above, as if set forth fully herein.

84. Article I, Section 1 of the Pennsylvania Constitution states that all persons in the Commonwealth have inherent and indefeasible rights to life, liberty, property, and privacy. Pa. Const. art. I, pt. 1. Residents of the Commonwealth may not be deprived of these rights without being afforded due process.

85. The Pennsylvania Code states that all persons between ages 6 and 21 residing in the Commonwealth are entitled to a free and full education in the Commonwealth's public schools. 22 Pa. Code § 12.1

86. Before excluding a student from school for more than ten consecutive school days, a Commonwealth school must give the student notice of the charges against him. It must then hold a formal hearing concerning the exclusion no more than fifteen school days from the date that notice was given. 22 Pa. Code § 12.8(b)(9).

87. This hearing may be held either (a) by the School Board, (b) by a committee of School Board members, or (c) by a qualified hearing examiner appointed by the School Board. 22 Pa. Code § 12.8(b).

88. Under the Local Agency Law, a "final order, decree, decision, determination, or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities, or obligations of any or all of the parties to the proceeding" is an adjudication. 2 Pa. C.S. § 101. Such an adjudication is valid only if the parties have been afforded reasonable notice, a hearing, and an opportunity to be heard, and the result is delivered in writing, contains findings, and is served on all parties. *See id.* at §§ 553, 555.

89. The District deprived J. H.-B. of his statutorily-protected right to attend his educational placement at East High School and MCTI without offering him an opportunity to be heard or any way of challenging the determination. The District thus violated the Local Agency Law, §§ 551-555, by rendering an adjudicatory decision without reasonable notice, a hearing, and an opportunity to be heard.

90. J. H.-B. was notified of the charges against him on September 19, 2017. He has never had a formal hearing of any kind despite being excluded from school for over three consecutive months. The District thus failed to hold a timely expulsion hearing, and thereby deprived J. H.-B. of his right to due process under the Pennsylvania Constitution, Pennsylvania Local Agency Law, the Pennsylvania Code, and the District's own policies[1].

---

[1] Board Policy 223 – Suspension and Expulsion, states "[e]xpulsion may range from one (1) day to permanent expulsion. No student shall be expelled without an opportunity for a formal hearing before the Board or before a

**WHEREFORE,** Plaintiff requests the following relief:

a.   Issuance of a judgment against the District declaring that the District violated the rights of Plaintiff as set forth in this Complaint;

b.   Expungement of J. H.B.'s disciplinary record; and

c.   Such other relief as the Court deems necessary and appropriate.


Date:   10 January 2019

Respectfully submitted,

Joshua M. Kershenbaum (PA ID 203270)
Michael D. Raffaele (PA ID 91615)
Kershenbaum & Raffaele, LLC
1230 County Line Road
Bryn Mawr, PA 19010
(610) 922-4200
(610) 646-0888 [fax]
Josh@MyKidsLawyer.com
Michael@MyKidsLawyer.com

*Counsel for Plaintiffs*

---

duly authorized committee of the Board.  A majority vote of the entire Board is required to expel a student." *Pocono Mountain School District Policy Manual*, Code 233, citing 24 P.S. 1318, 22 Pa. Code § 12.6, 22 Pa. Code §12.8.

12/26/2018  16:33    5706290742                GARVEY  AGENCY                          PAGE  01/01

## VERIFICATION

I, Tanya Hewlette-Bullard, am the Plaintiff in this action and hereby verify that the

statements made in the foregoing Complaint are true and correct to the best of my knowledge,

information and belief.

  I understand that the statements in said Complaint are made subject to the penalties of

Fed. R. Civ. P. 11, relating to false statements made in pleadings, and 18 Pa. C.S. §4904, relating

to falsification to authorities.

Date: ___12/19/18___

            _T. Hewlette-Bullard_
            Tanya Hewlette-Bullard, Plaintiff

G10 646-0888

**UNITED STATES DISTRICT COURT**
**FOR THE**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**CODE OF PROFESSIONAL CONDUCT**

**As a member of the Bar of the United States District Court for the Middle District of Pennsylvania, I will strive for the following professional ideal:**

1. The rule of law will govern my entire conduct. I will not violate the law or place myself above the law.

2. I will treat with civility and respect the lawyers, clients, opposing parties, the court and all the officials with whom I work. Professional courtesy is compatible with vigorous advocacy and zealous representation. Even though antagonism may be expected by my client, it is not part of my duty to my client.

3. I will respect other lawyers' schedules as my own, and will seek agreement on meetings, depositions, hearings, and trial dates. A reasonable request for a scheduling accommodation should never be unreasonably refused.

4. Communications are life lines. I will keep the lines open. Telephone calls and correspondence are a two-way channel; I will respond to them promptly.

5. I will be punctual in appointments, communications and in honoring scheduled appearances. Neglect and tardiness are demeaning to others and to the judicial system.

6. I will earnestly attempt to resolve differences through negotiation, expeditiously and without needless expense.

7. Procedural rules are necessary to judicial order and decorum. I will be mindful that pleadings, discovery processes and motions cost time and money. I will not use them heedlessly. If an adversary is entitled to something, I will provide it without unnecessary formalities.

8. I will not engage in conduct that brings disorder or disruption to the courtroom. I will advise my client and witnesses appearing in court of the proper conduct expected and required there and, to the best of my ability, prevent my client and witnesses from creating disorder or disruption.

9. Before dates for hearings or trials are set, or if that is not feasible immediately after such date has been set, I will attempt to verify the availability of necessary participants and witnesses so I can promptly notify the court of any likely problems.

I agree to subscribe to the above
Code of Professional Conduct:

_Joshua R. Kershenbaum / with permission Robert D. Tuffin_
Signature