# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TANYA HEWLETTE-BULLARD, on :   Civil No. 3:19-CV-00076
behalf of her minor child, J.H-B., :
                             :
          Plaintiff, :
                             :
          v. :
                             :
POCONO MOUNTAIN SCHOOL : 
DISTRICT, *et al.*, :
                             :
        Defendants. :   Judge Jennifer P. Wilson

## MEMORANDUM

This is a civil rights case arising from a school district's decision to exclude a high school student from classes based on the student's speech. The case is presently before the court on Defendants' motion for summary judgment. For the reasons that follow, the motion is granted in part and denied in part.

### PROCEDURAL HISTORY

Plaintiff Tanya Hewlette-Bullard ("Plaintiff" or "Ms. Hewlette-Bullard"), who brings suit on behalf of her son, J.H-B.,[1] initiated this suit through the filing of a complaint on January 11, 2019. (Doc. 1.) The complaint named as Defendants Pocono Mountain School District ("District"), Superintendent Dr. Elizabeth Robison ("Robison"), and Assistant Superintendent for Special Education Dr.

---

[1] The record indicates that J.H-B. was a minor at the time this suit was filed but has since reached the age of majority. The court will nevertheless identify this individual by his initials throughout this opinion instead of his full name for the sake of consistency with the parties' briefs and other earlier filings in this case.

Mary Beth Gustafson ("Gustafson").  (*Id.* ¶¶ 7–9.)  The complaint alleged

generally that J.H-B., who has been diagnosed with Autism Spectrum Disorder and

Tourette's Syndrome, was a student in East High School in the Pocono Mountain

School District in 2017 when he posted several memes[2] on Instagram[3] that were

considered offensive by people who had observed them.  (*Id.* ¶¶ 10–14.)

Defendants allegedly suspended J.H-B. as a result of the Instagram posts and did

not allow him to return to school for over three months.  (*Id.* ¶¶ 21–40.)  The

complaint alleged that the suspension and related actions violated J.H-B.'s civil

rights and raised several claims for violation of the First Amendment, the

Rehabilitation Act ("RA"), the Americans with Disabilities Act ("ADA"), and the

Pennsylvania Constitution.  (*Id.* ¶¶ 52–90.)

Defendants moved to dismiss the complaint on March 18, 2019, and Plaintiff

then filed an amended complaint on April 17, 2019.  (Docs. 8, 15.)  The amended

complaint raises causes of action for violation of J.H-B.'s right to free speech

---

[2] A meme is "an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially through social media."  *Meme*, MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY, https://unabridged.merriam-webster.com/unabridged/meme.

[3] Instagram is a social media website where users can share photos, videos, memes, and other content.  *See* https://www.instagram.com/.  In addition to Instagram, this opinion discusses several other social media websites, including Snapchat, Myspace, and Facebook.  Although there are differences between these websites, they can all be broadly understood as social media websites where users can share content with one another.

under the First Amendment, enforcement of a facially overbroad and vague speech restriction in violation of the First and Fourteenth Amendments, enforcement of an overbroad and vague content restriction in violation of the First and Fourteenth Amendments, discrimination in violation of the RA, discrimination in violation of the ADA, violation of J.H-B.'s right to equal protection under the Fourteenth Amendment, and violation of the due process and equal protection clauses of the Pennsylvania Constitution.  (Doc. 15.) Defendants answered the amended complaint on May 1, 2019.  (Doc. 16.)

Defendants filed the instant motion for summary judgment along with a statement of material facts and a supporting brief on March 2, 2020.  (Docs. 34, 34-1, 35.)  Plaintiff filed a brief in opposition to the motion, a response to Defendants' statement of material facts, and a separate statement of material facts on April 6, 2020.  (Docs. 43, 43-2, 43-3.)  Defendants filed a reply brief in support of the motion on April 20, 2020, making the motion ripe for the court's disposition. (Doc. 44.)

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States, and 28 U.S.C. § 1367, which

gives district courts supplemental jurisdiction over state law claims that are so closely related to federal claims as to be part of the same case or controversy.

### STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "'A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case.'" *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the

court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but instead, 'must set forth specific facts showing that there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the

5

non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.,*
*Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## MATERIAL FACTS

Although some of the material facts of this case are undisputed, the parties
present starkly different versions of the circumstances surrounding J.H-B.'s
exclusion from school. Accordingly, the court will indicate when a fact is disputed
and will view any disputed issues of fact in the light most favorable to Plaintiff as
the non-moving party. The facts in this section are derived from Plaintiff's
amended complaint, Defendants' answer, Defendants' statement of material facts,
Plaintiff's response to that statement, and Plaintiff's separate statement of material
facts. (*See* Docs. 15, 16, 34-1, 43-2, 43-3.)

At all times relevant to this lawsuit, J.H-B. was a student in Pocono
Mountain School District enrolled in East High School and the welding program at
Monroe Career & Technical Institute ("MCTI"). (Doc. 34-1, ¶ 1; Doc. 43-3, ¶ 1.)
J.H-B. has been diagnosed with Autism Spectrum Disorder and Tourette's
Syndrome, and has previously received special education services under the
Individuals with Disabilities Education Act ("IDEA"). (Doc. 15, ¶¶ 11–12; Doc.
16, ¶ 11–12.)

The District began investigating J.H-B.'s Instagram account during his
sophomore year in 2017. (Doc. 15, ¶ 21; Doc. 16, ¶ 21.) During that investigation,

the District found memes that J.H-B. had posted, which included images of the Las Vegas mass shooting, images of people using automatic weapons, images of black people captioned with racist language, references to school shootings, and references to ethnic cleansing.  (*See* Doc. 15, ¶ 25; Doc. 16, ¶ 25; Doc. 34-1, ¶ 10; Doc. 43-3, ¶ 10.)

After investigating J.H-B.'s Instagram account, the District convened a meeting with Ms. Hewlette-Bullard, during which it was agreed that J.H-B. would undergo a mental health assessment and a psychological evaluation.  (Doc. 15, ¶¶ 22–23; Doc. 16, ¶¶ 22–23.)  The District also required J.H-B. to regularly check in with District guidance counselors, which continued until Ms. Hewlette-Bullard requested that the district stop requiring such check-ins.  (Doc. 15, ¶ 24; Doc. 16, ¶ 24.)

Beginning on October 2, 2017, the District excluded J.H-B. from his regularly scheduled classes.[4]  (Doc. 15, ¶ 28; Doc. 16, ¶ 28.)  The parties provide different explanations as to why the exclusion from classes began.  According to Defendants' version of events, the District received statements from seven students at East High School representing that J.H-B. had made troubling statements to

---

[4] The parties disagree as to whether the exclusion from classes was a suspension or an expulsion. Given this disagreement, the court will use the neutral terminology that J.H-B. was excluded from his classes.

them during school hours and on school property indicating that he had a list of

thirteen other students that he planned to kill and that he had weapons that he

planned to use to carry out a mass shooting at the school.  (Doc. 34-1, ¶ 13.)  J.H-

B. also purportedly made comments about committing statutory rape, indicated

that he could easily hide a shank or other weapon in his shoe so as to evade

detection by school security, and made comments to the other students about

"chaining up black people and whipping them."  (*Id.* ¶¶ 13, 16.)  Students who had

heard the statements reportedly told the District that they thought the statements

should be taken seriously and treated as a threat to the school.  (*Id.* ¶ 14.)

Defendants assert that J.H-B.'s statements led the District to investigate his

Instagram account, and upon investigating the statements and the account, the

district "concluded that a credible threat existed."[5]  (*Id.* ¶ 25.)  The District

accordingly suspended J.H-B. based on its investigation into both the statements

and the Instagram posts.  (Doc. 16, ¶ 28.)

Plaintiff provides a starkly different version of the events surrounding J.H-

B.'s exclusion from classes.  Plaintiff notes that although J.H-B. acknowledges

using racist language while in school, *see* Doc. 34-1, ¶ 16; Doc. 43-3, ¶ 16, he

---

[5] As noted above, the memes that the District observed during this period included images of the
Las Vegas mass shooting, images of people using automatic weapons, images of black people
captioned with racist language, references to school shootings, and references to ethnic
cleansing.

denies making comments about statutory rape, denies that he ever had a list of students he wished to kill, denies that he ever told other students about any such list, and denies that he made any comments about bringing weapons into school or committing a shooting at the school.  (*See* Doc. 34-1, ¶¶ 13, 16; Doc. 43-3, ¶¶ 13, 16; J.H-B. Dep., pp. 71, 77, Doc. 34-2, pp. 19–20.)  According to Plaintiff, two other students at East High School reported the existence of J.H-B's "kill list" to school administrators, which prompted the Assistant Principal to search J.H-B.'s locker and belongings on September 19, 2017.  (Doc. 43-2, ¶¶ 6–9.)  No list was found during these searches.  (*Id.* ¶ 9.)  Ms. Hewlette-Bullard allowed the police to search her home based on the allegations against J.H-B., but the police did not find any evidence of wrongdoing, and J.H-B. was allowed to return to school the next day.  (*Id.* ¶¶ 10–11.)  Thus, given the lack of disciplinary action arising from J.H-B.'s alleged statements, Plaintiff asserts that J.H-B.'s Instagram account "became Defendants' central focus and primary reason for expelling him without due process of law."  (*Id.* ¶ 27.)

The parties' accounts also differ as to what process J.H-B. was afforded before and after the exclusion from classes began.  Although the parties agree that Ms. Hewlette-Bullard met with District representatives shortly after the District discovered J.H-B.'s Instagram account and that J.H-B. underwent a mental health assessment and a psychological evaluation after this meeting, Plaintiff asserts that

the District required J.H-B. to undergo these tests, while Defendants assert that the District merely suggested the tests and that Ms. Hewlette-Bullard concurred in the suggestion.  (Doc. 15, ¶¶ 22–23; Doc. 16, ¶¶ 22–23.)  It is undisputed that following multiple meetings between Ms. Hewlette-Bullard and the District, J.H-B. underwent between three and eight sessions of evaluation with Dr. Dustan A. Barabas.[6]  (Doc. 34-1, ¶ 45; Doc. 43-2, ¶ 45.)

The parties dispute whether the District provided J.H-B. with an informal hearing within five days of J.H-B. being excluded from classes as required by applicable Pennsylvania regulations.  (*See* Doc. 15, ¶ 30; Doc. 16, ¶ 30.)  It is undisputed, however, that Ms. Hewlette-Bullard had further meetings with the district after the exclusion began, during which representatives of the District expressed additional concerns regarding J.H-B.'s Instagram account.  (Doc. 15, ¶¶ 31–34; Doc. 16, ¶¶ 31–34.)  Ms. Hewlette-Bullard purportedly insisted that J.H-B. be allowed to return to school during these meetings, but Defendants dispute this contention.  (Doc. 15, ¶ 34; Doc. 16, ¶ 34.)  The District did not allow J.H-B. to return to school following the meetings with Ms. Hewlette-Bullard.  (Doc. 15, ¶

---

[6] The parties disagree as to whether this evaluation was psychiatric or psychological.  Defendants assert that Dr. Barabas conducted a psychiatric evaluation of J.H-B., while Plaintiff asserts that Dr. Barabas is a psychologist and accordingly conducted a psychological evaluation of J.H-B. (*See* Doc. 34-1, ¶ 45; Doc. 43-2, ¶ 45.)

35; Doc. 16, ¶ 35.)  Instead, the District began providing tutoring for J.H-B.  (Doc. 16, ¶ 35; Doc. 34-1, ¶ 46; Doc. 43-3, ¶ 46.)

Following his sessions with J.H-B., Dr. Barabas concluded on October 13, 2017 that J.H-B. was not a danger to himself or others and recommended that J.H-B. be allowed to return to school.  (Doc. 15, ¶ 38; Doc. 16, ¶ 38.)  Ms. Hewlette-Bullard immediately conveyed Dr. Barabas's conclusion to the district and asked that the District allow J.H-B. to return to his normal classes.  (Doc. 15, ¶ 39; Doc. 16, ¶ 39.)  The District did not allow J.H-B. to return to school, and instead requested that he undergo a forensic psychological evaluation, a psychoeducational evaluation, and a psychiatric evaluation.  (Doc. 15, ¶ 46; Doc. 16, ¶ 46.)

Ms. Hewlette-Bullard met with the District on December 7, 2017, to discuss J.H-B.'s educational placement.  (Doc. 15, ¶ 54; Doc. 16, ¶ 54.)  During that meeting, representatives from the District told Ms. Hewlette-Bullard that they would consider allowing J.H-B. to return to school if he was (1) accompanied by a full-time aide; (2) subjected to searches of his person and belongings whenever he entered East High School or MCTI; and (3) required to have daily check-ins with guidance counselors.  (Doc. 15, ¶ 58; Doc. 16, ¶ 58.)

At the conclusion of the December 7, 2017 meeting, Ms. Hewlette-Bullard and the District agreed that J.H-B. would be allowed to undergo the forensic psychological evaluation, psychoeducational evaluation, and psychiatric evaluation

once he was back in school.  (Doc. 15, ¶ 61; Doc. 16, ¶ 61.)  The District then filed a due process complaint against Ms. Hewlette-Bullard on December 19, 2017, seeking to have the assessments performed by evaluators chosen by the District. (Doc. 15, ¶ 62; Doc. 16, ¶ 62.)  The District and Ms. Hewlette-Bullard subsequently agreed on the three evaluators who would perform the assessments. (Doc. 15, ¶ 65; Doc. 16, ¶ 65.)

J.H-B. was allowed to return to school on January 11, 2018, at which point he was subjected to a weapons search and required to pass through a metal detector every day.  (Doc. 15, ¶ 66; Doc. 16, ¶ 66; Doc. 34-1, ¶ 60; Doc. 43-3, ¶ 60.)  In total, J.H-B.'s exclusion from his regularly scheduled classes continued for sixty-one and a half school days, but he continued to receive five hours a week of tutoring in three of his four classes during that period.  (Doc. 34-1, ¶ 46; Doc. 43-3, ¶ 46.)  Following his return to school, J.H-B. underwent a forensic psychological evaluation with Dr. William F. Anzalone, Jr., an independent educational evaluation with Dr. Steven Kachmar, and a forensic psychiatric evaluation with Dr. Richard Fischbein, all of whom concluded that J.H-B. was not a danger to himself or others.  (Doc. 15, ¶¶ 67–75; Doc. 16, ¶¶ 67–75.)

DISCUSSION

**A. Defendants' Motion Is Denied with Respect to the Claims that Defendants Violated J.H-B.'s First Amendment Rights**

The court begins its analysis with Defendants' argument that they are

entitled to summary judgment as to Plaintiff's First Amendment claims.  The First

Amendment protects the free speech rights of students in public school.  *Tinker v.*

*Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *W. Va. State Bd. of*

*Educ. v. Barnette*, 319 U.S. 624, 637 (1943).  Students do not "shed their

constitutional rights to freedom of speech or expression at the schoolhouse gate."

*Tinker*, 393 U.S. at 506.

Although school students continue to possess First Amendment freedoms

while in school, those freedoms are not completely unfettered.  Under *Tinker*, a

"narrow exception" exists that allows schools to "regulate speech that 'would

materially and substantially interfere with the requirements of appropriate

discipline in the operation of the school.'"  *B.L. ex rel. Levy v. Mahanoy Area Sch.*

*Dist.*, 964 F.3d 170, 177 (3d Cir. 2020), *cert. granted*, __ S. Ct. __, No. 20-255,

2021 WL 77251, at *1 (U.S. Jan. 8, 2021) (quoting *Tinker*, 393 U.S. at 509).  "To

exercise that regulatory power, however, schools must identify 'more than a mere

desire to avoid the discomfort and unpleasantness that always accompany an

unpopular viewpoint' and more than 'undifferentiated fear or apprehension of

13

disturbance.'" *Id.* (quoting *Tinker*, 393 U.S. at 508–09). A school may therefore prohibit student speech only when the school has "a specific and significant fear of disruption." *Id.* at 178 (quoting *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 926 (3d Cir. 2011)). The question of whether a student's speech is protected by the First Amendment is a question of law to be determined by the court. *See, e.g.*, *id.* at 176–81 (determining at summary judgment stage that student's speech was protected by the First Amendment); *cf. Munroe v. Central Bucks Sch. Dist.*, 805 F.3d 454, 466 (3d Cir. 2015) (stating in employment discrimination context that "whether or not speech is protected by the First Amendment constitutes a question of law").

Although a school has a limited power to regulate its students' speech, that power applies only when the students are speaking in a school context. *B.L.*, 964 F.3d at 178. The school context, however, is not limited solely to the physical space of a school. *Id.* Instead, the question of whether speech occurs in a school context focuses "not on physical boundaries but on the extent to which schools control or sponsor the forum or the speech." *Id.* at 179 (citing *Morse v. Frederick*, 551 U.S. 393, 400–01 (2007)).

Accordingly, to determine whether a student's speech is protected by the First Amendment, the court must determine whether the speech constitutes "on- or off-campus speech." *Id.* at 178. This analysis is made more difficult when the

student's speech occurs online, but the fact that a student's online speech involves the school in some way does not automatically establish that it is "on-campus" speech. *Id.* at 180. The student's online speech "is not rendered 'on campus' simply because it involves the school, mentions teachers or administrators, is shared with or accessible to students, or reaches the school environment." *Id.*

In *B.L.*, the Third Circuit considered a school's punishment of a high school student based on content she had posted on Snapchat. *Id.* at 175. The student, who was frustrated that she had not made the school's varsity cheerleading team, posted on Snapchat a photo of herself and a friend with their middle fingers raised to the camera with the caption "[f]uck school fuck softball fuck cheer fuck everything." *Id.* One of the student's teammates on the junior varsity cheerleading team took a screenshot of her post and sent it to the school's cheerleading coaches. *Id.* Upon receiving the screenshot, the coaches determined that the student's Snapchat post violated school and team rules and removed the student from the cheerleading team as punishment. *Id.* at 176. The coaches' decision was subsequently upheld by school authorities. *Id.*

The Third Circuit concluded that the student's speech was entitled to First Amendment protection under *Tinker* and its progeny because it was off campus. *Id.* at 180. The court noted that the student's speech did not take place in a "school-sponsored forum," in a context that "bears the imprimatur of the school,"

or on an online platform that was owned or operated by the school. *Id.* (internal quotation marks and alterations omitted). "Instead," the court reasoned, "B.L. created the snap away from campus, over the weekend, and without school resources, and she shared it on a social media platform unaffiliated with the school." *Id.* The court acknowledged that the student's Snapchat reached students and officials from the school, but held that this fact alone was not enough to render the post on-campus speech. *Id.* at 180–81.

The court's decision in *B.L.* was consistent with two earlier Third Circuit cases that were decided on the same day in which the court held that school districts could not, consistent with the First Amendment, punish students for fake Myspace profiles that satirized their schools' principals. *See J.S.*, 650 F.3d at 931; *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 216 (3d Cir. 2011). In those cases, the court noted that no Supreme Court or Third Circuit precedent has ever allowed public schools "to punish students for off-campus speech that is not school-sponsored or at a school-sponsored event and that caused no substantial disruption at school." *J.S.*, 650 F.3d at 933. Put simply, the First Amendment does not allow a school district "to reach into a child's home and control his/her actions there to the same extent that it can control that child when he/she participates in school sponsored activities." *Layshock*, 650 F.3d at 216.

The nature of the disruption that a student's speech causes at school is also an important consideration in the First Amendment context, as student speech that causes concerns regarding the safety of other students or threatens other students' safety may be entitled to less First Amendment protection than other student speech. *R.L. v. Cent. York Sch. Dist.*, 183 F. Supp. 3d 625, 636–37 (M.D. Pa. 2016). In *R.L.*, for example, a court in this district concluded that a student plaintiff's speech was not protected under the First Amendment when it "raised the specter of a bomb going off at the school the next day." *Id.* at 639. The case began when a student in the school found a note that said "there is a bomb in the school." *Id.* at 629. The school district immediately evacuated the building and notified the police of the threat. *Id.* Later that same morning, the students at the school were dismissed for the day. *Id.* The plaintiff returned home after the early dismissal and, while not on school property and using a personal computer, published a post on his personal Facebook page stating, "Plot twist, bomb isn't found and goes off tomorrow." *Id.* at 630. The school subsequently suspended the plaintiff for ten days based on the Facebook post and then expelled him for an additional thirteen days following a disciplinary hearing. *Id.* at 630–31. The plaintiff argued that his Facebook post was protected by the First Amendment, but the court disagreed, holding that the post was not entitled to First Amendment

protection under *Tinker* and accordingly granting the school's motion for summary judgment. *Id.* at 640. The court reasoned:

> It is surely beyond peradventure that student speech such as R.L.'s, which at best causes a real concern for student safety and at worst could be viewed as a threat to safety, is more likely to cause disruption than speech which is political or merely offensive to polite society. In light of the many school shootings that have tragically occurred over the past few decades, there can be no doubt that schools, parents, and students must take any suggestion of a bomb threat very seriously and with great cause for concern.

*Id.* at 636–37.

Other courts in this circuit have reached similar holdings to that reached in *R.L.* In *J.R.*, for example, the Western District of Pennsylvania held that a student's speech was not protected by the First Amendment where the student and some of his fellow students were overheard discussing "who they would shoot if they were to do a school shooting" and the student named a specific teacher that he would shoot in such a situation. *J.R. ex rel. Redden v. Penns Manor Area Sch. Dist.*, 373 F. Supp. 3d 550, 554 (W.D. Pa. 2019). The court held that the student's speech was not protected under *Tinker*, noting that there was no doubt that a "student who engages in conversations about school shootings with classmates might cause a substantial disruption in school activities and discipline." *Id.* at 563.

A student's speech that threatens school safety may be entitled to less First Amendment protection even where the speech occurs on social media rather than

in the student's school.  In *A.N.*, a student created a mash-up video that combined

fictional footage of a school shooting with audio from a popular song that

contained lyrics about school shootings, and posted the mash-up on Instagram with

the caption "see you next year, if you're still alive."  *A.N. ex rel. Niziolek v. Upper*

*Perkiomen Sch. Dist.*, 228 F. Supp. 3d 391, 393–94 (E.D. Pa. 2017).  Other

Instagram users saw the post and reported it to school and law enforcement

authorities, which prompted a hurried police investigation and a closure of the

school district the following day.  *Id.* at 394–95.  The school district subsequently

suspended the student and sought to expel him, which prompted the student to

bring suit in the Eastern District of Pennsylvania seeking injunctive relief.  *Id.* at

396.  The court denied the student's motion for preliminary injunction, finding that

the student's speech was not protected under *Tinker* because the speech "created a

substantial disruption to the school environment."  *Id.* at 400.[7]

In this case, Defendants argue that J.H-B.'s speech is not protected under the

First Amendment because "in-school statements about a kill list" and statutory rape

are not protected by the First Amendment.  (Doc. 35, p. 9.)  Defendants assert that

J.H-B. told other students that he had a "kill list," that he intended to commit a

---

[7] Notably, *A.N.* was decided prior to the Third Circuit's decision in *B.L.*, 964 F.3d at 178–81, which, as discussed above, clarified the circumstances in which *Tinker* may be applied to a student's online speech.

shooting at the school, and that he intended to conceal weapons for that purpose, and assert that such speech is not protected by the First Amendment.  (*Id.* at 10–11.)  Defendants further assert that J.H-B.'s Instagram posts "served to strengthen the school district's concerns about whether J.H-B.'s statements [about] 'shooting up the school' constituted a real danger."  (*Id.* at 10.)

Plaintiff argues that genuine issues of material fact preclude the entry of summary judgment on the First Amendment claims.  (Doc. 43, pp. 11–21.) Specifically, Plaintiff notes that there is a genuine factual dispute as to whether J.H-B. ever had a "kill list" or told other students about such a list.  (*Id.* at 12–13.) Plaintiff also notes that there is a genuine issue of material fact as to whether J.H-B.'s exclusion from classes was based on the accusation that he had a kill list or whether it was actually based on J.H-B.'s Instagram posts.  (*Id.* at 13–14.)

Having reviewed the parties' arguments, the court will deny the motion for summary judgment as to Plaintiff's First Amendment claims because there are multiple issues of material fact that preclude the entry of summary judgment. Most notably, there is a genuine dispute as to whether J.H-B. had a list of students that he wanted to kill, whether he ever told other students about such a list, and whether he ever made any other statements that threatened violence in the school. (*See* Doc. 34-1, ¶¶ 13–14; Doc. 43-3, ¶¶ 13–14.)  This dispute is material because it would likely alter whether J.H-B.'s speech was protected under the First

20

Amendment.  If J.H-B. made statements to other students that threatened violence, his speech would likely be unprotected.  *See R.L.*, 183 F. Supp. 3d at 639 (finding student's speech unprotected where school administrators reasonably interpreted speech as threatening that a bomb would go off at the school); *J.R.*, 373 F. Supp. 3d at 563 (finding that student's speech about who he would shoot in a hypothetical school shooting was not protected).  If, on the other hand, J.H-B. did not make any statements that threatened violence, then the only speech that is relevant to the case would be J.H-B.'s Instagram posts, which are likely protected under controlling Third Circuit precedent.  *See B.L.*, 964 F.3d at 180–81 (holding that school could not punish student for off-campus profane statement made on Snapchat); *J.S.*, 650 F.3d at 931 (holding that school could not punish student for fake Myspace profile that mocked school principal); *Layshock*, 650 F.3d at 216 (same).[8]

 There is also a genuine issue of material fact as to whether J.H-B.'s alleged threatening in-school statements were the cause of his exclusion from classes or whether the exclusion was actually caused by his Instagram posts.  (*See* Doc. 16, ¶ 28; 34-1, ¶ 25; Doc. 43-3, ¶ 27.)  Although Defendants argue that J.H-B.'s in-

---

[8] The court does not reach an ultimate conclusion as to whether J.H-B.'s speech was protected. The court's holding in this section is limited to the finding that genuine issues of material fact preclude the entry of summary judgment.

school statements caused the exclusion, *see* Doc. 35, p. 10, a reasonable finder of fact could conclude otherwise, as the district investigated J.H-B.'s alleged in-school statements on September 19, 2017, but did not exclude him from classes until October 2, 2017, after it had reviewed J.H-B.'s Instagram posts in the interim. (*See* Doc. 15, ¶ 28; Doc. 16, ¶ 28; Doc. 43-2, ¶ 6.)  Given the lapse of time between the initial investigation and the exclusion from classes, a reasonable finder of fact could conclude that it was actually the Instagram posts that caused J.H-B.'s exclusion from classes, rather than his alleged in-school statements.  This is a material issue of fact, because, as noted above, the alleged in-school statements and the Instagram posts likely are not entitled to the same protections under the First Amendment.

Accordingly, because there are genuine issues of material fact that are relevant to the issue of whether Defendants violated J.H-B.'s rights under the First Amendment, the court will deny Defendants' motion for summary judgment with respect to Plaintiff's First Amendment claims.

### B. Defendants' Motion for Summary Judgment Is Granted as to Plaintiff's Overbreadth and Vagueness Claims

The court next considers whether Defendants are entitled to summary judgment as to Plaintiff's overbreadth and vagueness claims.  Under the First Amendment's overbreadth doctrine, a court may strike down a law that inhibits the

exercise of First Amendment rights "if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999).  To be struck down as overbroad, a law must be "*substantially* overbroad."  *United States v. Williams*, 553 U.S. 285, 303 (2008).  It is not enough for a plaintiff to point to one impermissible application of the law.  *Free Speech Coalition, Inc. v. Att'y Gen. of U.S.*, 677 F.3d 519, 537 (3d Cir. 2012).

The first step in an overbreadth analysis is to construe the language of the law in question to determine what language or conduct the law covers.  *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 241–42 (3d Cir. 2010) (citing *Williams*, 553 U.S. at 293).  After that, the court should consider whether the law, as it has been construed, "penalizes a substantial amount of protected expressive activity."  *McCauley*, 618 F.3d at 242 (quoting *Williams*, 553 U.S. at 297).  When considering whether the law is overbroad, the court should consider a number of factors, including "(1) the number of valid applications of the statute; (2) the historic or likely frequency of conceivably impermissible applications; (3) the nature of the activity or conduct sought to be regulated; and (4) the nature of the state interest underlying the regulation."  *Free Speech Coalition*, 677 F.3d at 537–38 (quoting *Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 226 (3d Cir. 2004)).

23

Striking down a law under the overbreadth doctrine is "strong medicine" that should not be "casually employed." *United States v. Sineneng-Smith*, 590 U.S. __, 140 S. Ct. 1575, 1581 (2020) (quoting *Williams*, 553 U.S. at 293). The doctrine should only be applied to invalidate a statute as a "last resort." *Free Speech Coalition*, 677 F.3d at 537 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). Before striking down a law as overbroad, "the court must first determine that the regulation is not 'susceptible to a reasonable limiting construction.'" *J.S.*, 650 F.3d at 934 (quoting *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001)). Every reasonable construction must be considered before the court may deem the law unconstitutionally overbroad. *McCauley*, 618 F.3d at 242 (quoting *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 259 (3d Cir. 2002)).

The overbreadth doctrine may be applied in an educational setting, *DeJohn v. Temple Univ.*, 537 F.3d 301, 313 (3d Cir. 2008), but a court should be especially hesitant to strike down a law as overbroad in the education setting. *J.S.*, 650 F.3d at 935 (citing *Sypniewski*, 307 F.3d at 259). A school "may permissibly regulate a broader range of speech than could be regulated for the general public, giving school regulations a larger plainly legitimate sweep." *Id.* (quoting *Sypniewski*, 307 F.3d at 259). Accordingly, a school disciplinary policy may only be struck down

as overbroad after the court has considered "the special needs of school discipline."

*Id.* (quoting *Sypniewski*, 307 F.3d at 260).

Plaintiff's overbreadth challenge in this case is based on District Board

Policy 220.  (*See* Defendants' Exhibit 6, Doc. 34-2, pp. 205–06.)  The policy reads

in relevant part:

> The Board reserves the right to designate and prohibit manifestations of student expression which are not protected by the right of free expression because they violate the rights of others.  Such expressions are those which:
>
> 1.  Defame or invade the privacy of any specific person or persons.
>
> 2.  Pose an imminent risk or substantial interference with the educational process, including school activities, school work, or discipline and order on school property or school functions; threaten harm to the school or community; encourage unlawful activity; or interfere with another's rights so as to deny them the benefits of their educational program.
>
> 3.  Constitute[] harassment or [are] part of a pattern of harassment as defined by Board policy.
>
> 4.  Advocate the use or advertise the availability of any substance or material which may reasonably be believed to constitute a direct and substantial danger to the health of students.
>
> 5.  Are vulgar, lewd, profane, obscene or contain material otherwise deemed to be harmful to impressionable students who may receive them.
>
> 6.  Incite violence, advocate the use of force, or urge the violation of law or school regulations.

7. Solicit funds for non-school organizations or institutions when such solicitations have not been approved by the Board.

8. In determining what expression may be regulated the Board shall consider the age, grade level and circumstances of both the student making such expression and the audience to whom expression is made.

(*Id.*)

Defendants in this case argue that they are entitled to summary judgment as to Plaintiff's overbreadth challenge because J.H-B.'s speech was not protected under the First Amendment.  (Doc. 35, pp. 17–19.)  Plaintiff argues that the policy is overbroad on its face because it applies to both on- and off-campus speech despite the fact that the policy was revised after the Third Circuit's decisions in *J.S.* and *Layshock*.  (Doc. 43, p. 26.)  Plaintiff also notes that the policy "does not specify when or where it applies to students" and gives the District "virtually unfettered discretion" to regulate student speech.  (*Id.*)

Defendants' argument misapprehends the standards governing an overbreadth analysis.  The First Amendment overbreadth doctrine allows a plaintiff to bring a facial challenge to a law "even though it is not unconstitutional as applied to that particular party, because 'the [law]'s very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'"  *Free Speech Coalition*, 677 F.3d at 537 (quoting *Broadrick*, 413 U.S. at 612).  Thus, even if Defendants were correct that J.H-B.'s speech was

26

unprotected under the First Amendment, this would not defeat Plaintiff's ability to bring an overbreadth challenge to the District policy.

Nevertheless, the court will still grant summary judgment to Defendants on Plaintiff's overbreadth challenge because a reasonable limiting construction of the District's policy shows that it is not overbroad.  *See McCauley*, 618 F.3d at 242 (stating that every reasonable limiting construction must be considered before a court may deem a law overbroad).  The District's policy gives the District the power "to designate and prohibit manifestations of student expression *which are not protected by the right of free expression* because they violate the rights of others."  (Doc. 34-2, p. 205 (emphasis added).)  It is reasonable to read the language "not protected by the right of free expression" as a limiting clause clarifying that the District's policy is coextensive with the First Amendment right of free expression.  The policy therefore does not penalize "a substantial amount of protected expressive activity," *McCauley*, 618 F.3d at 242, because, by its terms, it is limited to expression that is not protected by the First Amendment right to freedom of expression.  The court will therefore decline to apply the strong medicine of the overbreadth doctrine and grant Defendants summary judgment as to Plaintiff's overbreadth challenge.

Plaintiff's vagueness challenges to the District's policy also fail.  A law is unconstitutionally vague "if it does not allow a person of ordinary intelligence to

27

determine what conduct it prohibits, or if it authorizes arbitrary enforcement." *J.S.*, 650 F.3d at 935 (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).  A law may be unconstitutionally vague both on its face and as applied to a particular plaintiff. *United States v. John-Baptiste*, 747 F.3d 186, 200 (3d Cir. 2014).  To establish that a law is vague on its face, a plaintiff must "demonstrate that the law is impermissibly vague in all of its applications." *CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 631 (3d Cir. 2013) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982)).  An as-applied vagueness challenge, on the other hand, is "undertaken on a case-by-case basis, and a reviewing court must determine whether the statute is vague as-applied to the affected party." *United States v. Fullmer*, 584 F.3d 132, 152 (3d Cir. 2009) (citing *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992)).

The standard governing vagueness challenges is "more relaxed in the school environment" and a school district policy does not need to be as detailed as a provision in a criminal code.  *Id.* (citing *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986)).  School disciplinary policies differ from criminal provisions in that the school policies must be written in such a way as to give schools the ability to "impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process."  *Bethel Sch. Dist.*, 478 U.S. at 686. Accordingly, a court should only strike down a school district policy as

28

unconstitutionally vague "when the vagueness is especially problematic."  *Id.* (quoting *Sypniewski*, 307 F.3d at 266).

In this case, Plaintiff brings both facial and as-applied vagueness challenges to District Policy 220.  (*See* Doc. 15, ¶¶ 100–29.)  Defendants argue that they should be granted summary judgment as to the vagueness challenge because the policy was neither unconstitutionally vague on its face nor as applied to J.H-B.'s particular actions in this case.  (Doc. 35, pp. 17–19.)  Plaintiff argues that the policy is impermissibly vague because it appears to apply to both on- and off-campus speech, does not specify when or where it applies to student speech, and offers "virtually unfettered discretion" to District officials to regulate student speech.  (Doc. 43, p. 26.)  Plaintiff also argues that the policy is impermissibly vague as applied to J.H-B.'s speech because Defendants "disciplined J.H-B. for off-campus speech that they deemed to be offensive as if it were on-campus speech merely because they, through their investigation, had sparked discussion about his off-campus speech on school grounds and during school hours."  (*Id.*)  Plaintiff argues that at the very least, there is "a genuine dispute as to the material fact of whether the Defendants applied Board Policy 220 to J.H-B. in a way that is impermissibl[y] vague."  (*Id.*)

The court will grant Defendants' motion for summary judgment with respect to Plaintiff's vagueness challenges.  Plaintiff's facial vagueness challenge fails

because the policy is not impermissibly vague in its application to on-campus speech, and Plaintiff accordingly fails to show that the policy is "impermissibly vague in all of its applications." *CMR D.N. Corp.*, 703 F.3d at 631.  Plaintiff's as-applied challenge also fails because, although the policy is somewhat vague as to whether a student must be on school property for the policy to apply, that vagueness is not "especially problematic," *Bethel Sch. Dist.*, 478 U.S. at 686, as no Supreme Court or Third Circuit precedent states that a school may only regulate a student's speech when the student is on school property.  *See B.L.*, 964 F.3d at 178 ("It is 'well established' that the boundary demarcating schools' heightened authority to regulate student speech 'is not constructed solely of the bricks and mortar surrounding the school yard.'" (quoting *Layshock*, 650 F.3d at 216)).  Accordingly, the motion for summary judgment will be granted as to Plaintiff's facial and as-applied vagueness claims.

### C. Defendants' Motion for Summary Judgment Is Denied with Respect to Plaintiff's Due Process Claim

A school district must provide a student due process before it excludes him from classes.  *Goss v. Lopez*, 419 U.S. 565, 574 (1975).  Although the precise requirements of due process are flexible, students facing exclusion from classes must, at minimum, "be given some kind of notice and afforded some kind of hearing."  *Id.* at 579.  Thus, "the student [must] be given oral or written notice of

30

the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581. To satisfy due process, the district is not required to provide the student an opportunity to secure counsel, cross-examine witnesses, or call his own witnesses, but it still must provide effective notice and an informal hearing. *Id.* at 583.

The Supreme Court's holding in *Goss* was expressly limited to "short" suspensions not exceeding ten days in duration. *Id.* at 584. The Court noted that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Id.* The Third Circuit has since clarified that a school imposing a more severe suspension, must, at a minimum, provide the process required in *Goss*. *See Palmer ex rel. Palmer v. Merluzzi*, 868 F.2d 90, 93 (3d Cir. 1989) (stating that *Goss* set constitutional minimum process where student was given a ten-day suspension from school and a sixty-day suspension from school-sponsored athletics).

It remains an open question in this circuit whether a school imposing a suspension for longer than ten days must provide more formal process than what is required by *Goss*. In other words, although the procedures set forth in *Goss* are necessary before a school may impose a suspension exceeding ten days, it is unclear whether those procedures are sufficient. At least one court in this circuit, relying on *Palmer*, has concluded that more formal process is "not necessarily"

31

required before a school district may impose a suspension exceeding ten days, *Haney v. West Chester Univ.*, No. 18-CV-02456, 2018 WL 3917975, at *6 (E.D. Pa. Aug. 16, 2018), but this issue has not been resolved by the Supreme Court or the Third Circuit.

In this case, although J.H-B.'s exclusion from classes was more than ten days in duration, the court need not determine whether a more formal process was required because there are genuine issues of material fact as to whether the District provided J.H-B. even the minimal procedural protections required by *Goss*. The parties dispute whether the District provided J.H-B. any hearing regarding his exclusion from classes. (*See* Doc. 15, ¶ 30; Doc. 16, ¶ 30.) Although it is undisputed that Ms. Hewlette-Bullard attended numerous meetings with District officials before the exclusion from classes began and while the exclusion was ongoing, *see* Doc. 34-1, ¶¶ 41–44; Doc. 43-3, ¶¶ 41–44, it is not clear from the record before the court whether those meetings qualify as hearings under *Goss*. Notably, by the District's own admission, it was during one of these meetings that district officials explained to Ms. Hewlette-Bullard and J.H-B. that J.H-B. would be suspended from school and that the District would be conducting an investigation into the allegations against him. (*See* Doc. 34-1, ¶ 42.) Based on those facts, a reasonable finder of fact could conclude that the District did not provide J.H-B. "an explanation of the evidence the authorities ha[d] and an

opportunity to present his side of the story" before suspending him from school. *Goss*, 419 U.S. at 581. Accordingly, the court will deny Defendants' motion for summary judgment with respect to Plaintiff's due process claim because there are genuine issues of material fact that preclude the entry of summary judgment.

### D. Defendants' Motion Is Granted with Respect to the Equal Protection Claim

The court will next consider whether Defendants are entitled to summary judgment as to Plaintiff's equal protection claim. Plaintiff's equal protection claim is based on a class of one theory. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564–65 (2000). Specifically, Plaintiff alleges that J.H-B. was treated differently than his similarly situated peers because Defendants were uncomfortable and fearful of J.H-B.'s "neuroatypicality." (Doc. 15, ¶¶ 147, 152.)

To establish an equal protection claim under a class of one theory, a plaintiff must prove that "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 156 (3d Cir. 2018) (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006)). Individuals are similarly situated if they are alike ""in all relevant respects." *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

Rational basis review is "a very deferential standard." *Newark Cab Ass'n*, 901 F.3d at 156.  Under a rational basis standard, the court should uphold the differential treatment "if there is any reasonably conceivable state of facts that could provide a rational basis" for it.  *Id.* (quoting *United States v. Walker*, 473 F.3d 71, 77 (3d Cir. 2007)).  The threshold for a government action to meet this standard is "extremely low" and can be met even where the government action is based on "rational speculation unsupported by evidence or empirical data." *Cabrera v. Att'y Gen. of U.S.*, 921 F.3d 401, 404 (3d Cir. 2019) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)).  The plaintiff asserting that there is no rational basis for the government's classification "must negate every conceivable justification for the classification in order to prove that the classification is wholly irrational."  *Id.* (quoting *Brian B. ex rel. Lois B. v. Commw. Of Pa. Dep't of Educ.*, 230 F.3d 582, 586 (3d Cir. 2000)).  Thus, in considering whether a government action satisfies the rational basis test, a court may consider "any conceivable purpose" for the government action and is "'not limited to considering only the goal stated by the' state actor."  *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 216 (3d Cir. 2013) (quoting *Ramsgate Ct. Townhome Ass'n v. West Chester Borough*, 313 F.3d 157, 160 (3d Cir. 2002)).

Defendants in this case argue that they are entitled to summary judgment as to the equal protection claim because there is no evidence that J.H-B. was actually

considered disabled or that he was treated differently from similarly situated students who were "disciplined for the same type and level of conduct." (Doc. 35, p. 20.) Plaintiff argues that there is evidence that J.H-B. was treated differently from his similarly situated peers because there is evidence that another student in the District threatened a school shooting on social media and was given a less severe punishment than J.H-B. was given. (Doc. 43, pp. 33–34; *see also* Robison Dep., pp. 49–53, Doc. 34-2. pp. 197–98.) Defendants respond with three arguments in their reply brief. First, Defendants argue that J.H-B. and the other student who purportedly threatened a school shooting are not similarly situated because there was no evidence that the other student had a "kill list" or told other students about such a list. (Doc. 44, p. 12.) Second, Defendants argue that there is no evidence that the district intentionally discriminated against J.H-B. (*Id.* at 12–13.) Third, Defendants argue that there was a rational basis for the District's differential treatment of J.H-B. given the nature of the threat that he made to other students at the school. (*Id.* at 13.)

Upon consideration of the record evidence and the parties' arguments, the court will grant Defendants' motion for summary judgment with respect to the equal protection claim because there were multiple rational reasons for treating J.H-B. differently from the other student who had purportedly threatened a school shooting.

The primary reason that it was rational to treat the two students differently was that the nature of the threats to the school was different.  Multiple students allegedly reported that J.H-B. had a "kill list," that he told other students about that list, and that he told other students about plans to commit a mass shooting at the school.  By contrast, the other student stated on Snapchat that "West[9] may be shot TF up tomorrow.  Don't go."  (*See* Robison Dep., p. 50, Doc. 34-2, p. 197.)  It was therefore rational to treat the two situations differently because J.H-B.'s speech could be reasonably interpreted as a direct threat that he was going to commit a shooting, while the other student's speech could be interpreted as a warning that a *different* student might commit a shooting.  Although there are questions of fact as to whether J.H-B. actually had a kill list or made any threat, it is undisputed that other students reported the existence of his kill list to District officials and reported that he had threatened violence in the school, *see* Doc. 34-1, ¶ 13; Doc. 43-2, ¶¶ 6–8.  The District therefore had a rational basis for treating J.H-B. differently because a rational basis may be based on "rational speculation unsupported by evidence or empirical data."  *Cabrera*, 921 F.3d at 404.

Similarly, it was rational to treat the two students differently because J.H-B. allegedly threatened school violence while he was talking to other students on

---

[9] The student's reference to "West" was apparently a reference to Pocono Mountain West High School, another high school in the district.  (*See* Robison Dep., p. 50, Doc. 34-2, p. 197.)

school property, while the other student's threat was made on Snapchat.  The fact

that J.H-B. purportedly made the threat during an in-person conversation could

have rationally led District officials to believe that the threat was more credible

than a threat made via social media.  Accordingly, because there was a rational

basis for the district's differential treatment of J.H-B., the court will grant

Defendants' motion for summary judgment with respect to the equal protection

claim.

### E.  The Motion Is Granted as to the ADA and RA Claims

Title II of the ADA states that "no qualified individual with a disability

shall, by reason of such disability, be excluded from participation in or be denied

the benefits of the services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Section 504

of the RA similarly provides that "[n]o otherwise qualified individual with a

disability . . . shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under

any program or activity receiving Federal financial assistance."  29 U.S.C. § 794.

Claims under the ADA and the RA are generally subject to the same

substantive standard.  *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d

249, 260 (3d Cir. 2013) (citing *Chambers ex rel. Chambers v. Sch. Dist. of Phila.

Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009)).  A student alleging that he has

been discriminated against by a school under the ADA and the RA must prove that

he "(1) has a disability; (2) was otherwise qualified to participate in a school

program; and (3) was denied the benefits of the program or was otherwise subject

to discrimination because of [his] disability." *Id.* (quoting *Chambers*, 587 F.3d at

189).

Although both statutes require a plaintiff to prove that the discrimination

occurred because of his disability, the ADA and the RA's "respective causation

elements differ." *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 235 (3d Cir. 2013).

"The RA allows a plaintiff to recover if he or she were deprived of an opportunity

to participate in a program solely on the basis of disability, while the ADA covers

discrimination on the basis of disability, even if there is another cause as well." *Id.*

at 235–36.  Both statutes ultimately require plaintiffs to prove "that they were

treated differently based on the protected characteristic, namely the existence of

their disability." *Id.* at 236.

Defendants in this case argue that they should be granted summary judgment

as to the ADA and RA claims because Plaintiff cannot meet any of the substantive

elements of those claims.  (Doc. 35, pp. 21–23.)  Specifically, Defendants argue

that J.H-B. cannot establish that he was disabled because he "was not considered or

treated as disabled at the time of his actions."  (*Id.* at 22.)  Defendants further argue

that J.H-B. was not denied the benefit of a program because he was kept out of

school with his mother's agreement and not by the District's unilateral decision.
(*Id.*)  Finally, Defendants argue that Plaintiff cannot establish causation under the
ADA or the RA because there is no evidence that J.H-B.'s Autism Spectrum
Disorder or Tourette's Syndrome motivated the defendants to view his speech any
differently or to exclude him from classes.  (*Id.*)

Plaintiff argues that J.H-B.'s Autism Spectrum Disorder and Tourette's
Syndrome constitute disabilities under the ADA and the RA and that J.H-B. was
excluded from a public program when he was kept out of his regularly scheduled
classes.  (Doc. 43, p. 29.)  Plaintiff also argues that there is a genuine issue of
material fact as to whether Defendants discriminated against J.H-B. because of his
disability.  (*Id.* at 30.)  Plaintiff explains that Defendants:

> Made a decision that J.H-B. made Defendants and students feel
> "uncomfortable" and since J.H-B. did not act or respond to the
> Defendants' disapproval of his Instagram posts in the ways the
> Defendants expected or considered "normal," Defendants excluded
> J.H-B. from school. Defendants then demanded J.H-B. submit to
> evaluation after evaluation after evaluation, rejected the opinion and
> recommendation of Dr. Barabas, and continue to reject the opinions of
> Drs. Anzalone, Fishbein, and Kachmar because those professionals'
> conclusions do not support Defendants' belief that J.H-B. is abnormal.

(*Id.*)  "Put differently," Plaintiff continues:

> Defendants did not have a basis to exclude J.H-B. through proper
> school discipline procedures and J.H-B.'s parent did not consent to
> homebound instruction, so Defendants chose to treat J.H-B. differently
> and worse than his nondisabled peers because of his disabilities.   And

39

they did so by barring J.H-B. from school longer, and subjecting him to
more invasions of his personal dignity than, any non-disabled peer.

(*Id.* at 31–32.)

Having reviewed the parties' arguments, the court will grant Defendants'

motion with respect to the ADA and RA claims because Plaintiff has not produced

any evidence to support her contention that J.H-B. was discriminated against

because of his disability.  The only evidence Plaintiff cites to support her causation

argument is two short deposition excerpts, one from the deposition of Defendant

Robison, the other from the deposition of Amy Buffington ("Buffington"), who

served as the Assistant Principal at East High School during the period relevant to

this lawsuit.  (*See* Robison Dep., p. 81, Doc. 43-12, p. 81; Buffington Dep., pp.

151–52, Doc. 43-14, pp. 151–52.)  Robison testified that she did not know if any

other students in the District had ever been excluded from classes for as long as

J.H-B. had been excluded without a hearing or parental approval.  (Robison Dep.,

p. 81, Doc. 43-12, p. 81.)  Buffington testified that she could not recall any

situations in which a non-disabled student had been excluded from classes for a

period as long as J.H-B. had been excluded from classes.  (Buffington Dep., pp.

151–52, Doc. 43-14, pp. 151–52.)  Neither of these deposition excerpts supports

the contention that J.H-B. was discriminated against because of his disability.

Plaintiff's ADA and RA claims accordingly fail because Plaintiff has not provided

any evidence of causation and therefore has failed "to make a showing sufficient to establish the existence of an element" that she must prove to establish her claims. *Celotex*, 477 U.S. at 322. The court will therefore grant Defendants' motion with respect to the ADA and RA claims.

### F. The Individual Defendants Are Entitled to Qualified Immunity as to Plaintiff's First Amendment Claim

The doctrine of qualified immunity recognizes that despite their participation in constitutionally impermissible conduct, government officials "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818).

Defendants asserting that they are entitled to qualified immunity have the burden to prove that the doctrine applies. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014). Courts follow a two-pronged test to determine whether qualified immunity applies. *Pearson*, 555 U.S. at 232. First, the court must determine

41

whether the defendants violated the plaintiff's statutory or constitutional right. *District of Columbia v. Wesby*, 583 U.S. __, 138 S. Ct. 577, 589 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Second, the court must determine whether the right at issue was clearly established at the time of the violation. *Id.* (citing *Reichle*, 566 U.S. at 664). The court may exercise its discretion in deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

A right is clearly established if "every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle*, 566 U.S. at 665). To be clearly established, there does not have to be a case that is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)). In determining whether a right is clearly established, courts must not define the right "at a high level of generality." *Id.* (quoting *Al-Kidd*, 563 U.S. at 742.) Rather, the analysis should focus on "whether the violative nature of *particular* conduct is clearly established." *Id.* (quoting *Al-Kidd*, 563 U.S. at 742.) The qualified immunity doctrine "protects all but the plainly incompetent or those who knowingly violate the law." *Kisela v.*

42

*Hughes*, 584 U.S. __, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 580

U.S. __, 137 S. Ct. 548, 551 (2017)).

Defendants Robison and Gustafson argue that they are entitled to qualified

immunity as to Plaintiff's First Amendment claim because it was not clearly

established at the time of J.H-B.'s conduct that *Tinker* could be applied to a

student's social media posts.  (Doc. 35, p. 29.)  Defendants further argue that they

are entitled to qualified immunity to the extent that the First Amendment claim is

based on J.H-B.'s alleged in-school statements because "[t]here is no clearly

established right to publish [a] 'hit or kill list.'"  *Id.*  Plaintiff argues it is clearly

established under *J.S.* and *Layshock* that a school district may not punish a student

for his social media posts, and argues that the Defendants' assertion of qualified

immunity should accordingly be denied because there are genuine issues of

material fact as to whether J.-H.B's exclusion from classes was based on his social

media posts.  (Doc. 43, pp. 35–36.)

The court concludes that Defendants Robison and Gustafson are entitled to

qualified immunity as to Plaintiff's First Amendment claim.  Although there are

questions of fact as to whether the Defendants violated J.H-B.'s First Amendment

rights by punishing him for his Instagram posts, Defendants are correct that it was

not clearly established at the time of the incident that a student's social media posts

were protected by the First Amendment and *Tinker*.

43

The lack of clearly established law at the time of J.H-B's exclusion from classes is illustrated by the Third Circuit's decision in *B.L.*, where the court noted that there was no controlling precedent on the issue of when a student's online speech could be considered on campus for purpose of school discipline.  *B.L.*, 964 F.3d at 178–80.  The court acknowledged that *J.S.* and *Layshock* had addressed school discipline arising from a student's online speech, but cautioned that the online speech in those cases was "not far removed from the school environment" because it "attacked school officials, used photos copied from the schools' websites, [was] shared with students, caused gossip at school and, in *Layshock*, [was] viewed on school computers."  *Id.* at 180.  Thus, although the *B.L.* court applied principles from *J.S.* and *Layshock*, its decision was not directly controlled by those cases.  *See id.* at 180–81.

The court accordingly finds that prior to *B.L.*, it was not clearly established that a student's off-campus social media post was protected by the First Amendment as it pertained to school disciplinary procedures.  *See R.L.*, 183 F. Supp. 3d at 647 (concluding, prior to *B.L.*, that defendant was entitled to qualified immunity because it was not clearly established whether First Amendment and *Tinker* applied to student's off-campus online speech).  Defendants Robison and Gustafson are accordingly entitled to qualified immunity to the extent that J.H-B.'s First Amendment claim arises from his Instagram post.  Defendants Robison and

Gustafson are also entitled to qualified immunity to the extent that the First Amendment claim is based on J.H-B.'s alleged in-school statements because, as noted above, those statements are likely not protected by the First Amendment.

The court accordingly grants Defendants Robison and Gustafson summary judgment as to Plaintiff's First Amendment claims based on qualified immunity. The court's grant of qualified immunity, however, is limited to the First Amendment claims, as Defendants have not advanced any arguments as to why they are entitled to qualified immunity against Plaintiff's other claims. *See Halsey*, 750 F.3d at 288 (noting that defendants asserting qualified immunity have the burden to prove that the doctrine applies).

### G. Plaintiff's Claims Under the Pennsylvania Constitution

Finally, Defendants argue that they should be granted summary judgment as to Plaintiff's due process and equal protection claims under the Pennsylvania Constitution because Pennsylvania law does not allow claims for money damages or claims against individual defendants for violations of the Pennsylvania Constitution. (Doc. 35, p. 30.) This argument for summary judgment is denied, because, as Plaintiff correctly notes, *see* Doc. 43, p. 36, the amended complaint does not raise any claims for money damages or claims against the individual defendants under the Pennsylvania Constitution. (*See* Doc. 15, ¶¶ 154–61.)

45

Defendants do not raise any summary judgment arguments regarding the merits of Plaintiff's Pennsylvania Constitution claims.[10]  (*See generally* Doc. 35.) Nevertheless, the court will grant Defendants summary judgment as to Plaintiff's equal protection claim under the Pennsylvania Constitution because the equal protection clause of the Pennsylvania Constitution is analyzed according to the same standards as the equal protection clause of the Fourteenth Amendment, *see Love v. Borough of Stroudsburg*, 597 A.2d 1137, 1140 (Pa. 1991); *accord Fouse v. Saratoga Partners, L.P.*, 204 A.3d 1028, 1033 n.9 (Pa. Commw. Ct. 2019), and, as noted above, Defendants are entitled to summary judgment as to Plaintiff's federal equal protection claim.  Summary judgment is therefore granted as to the equal protection claim under the Pennsylvania Constitution, but denied as to the due process claim under the Pennsylvania Constitution.

---

[10] Defendants belatedly assert an argument regarding the merits of the Pennsylvania constitutional claims in their reply brief, *see* Doc. 44, p. 15, but the court will not consider this argument because it was not raised in Defendants' supporting brief.  *See Interbusiness Bank, N.A. v. First Nat'l Bank of Mifflintown*, 328 F. Supp. 2d 522, 529 (M.D. Pa. 2004 ("It is improper for a party to present a new argument in [a] reply brief." (quoting *United States v. Medeiros*, 710 F. Supp. 106, 109 (M.D. Pa. 1989))).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  An appropriate order follows.

<u>s/Jennifer P. Wilson</u>
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: February 22, 2021